We are privileged to have sitting with us this morning, as a visiting judge, the Honorable John Chun of the Western District of Washington. Welcome, Judge Chun. Thank you. We have five cases on the calendar this morning. Until yesterday, we had six. One was settled in the Courthouse Steps. We have today one from the ITC, one from the PTAB, two from the District Courts, and one from the MSPB. That and one of the District Court appeals submitted on the briefs will not be argued. Our first case today is Crocs v. The International Trade Commission, 2024-1300. Mr. Cain. Thank you, Your Honor. May it please the Court, David Cain for Appellant Crocs. In this case, the Commission found that the accused marks are substantially similar to Crocs' registered product configuration marks, which we refer to as the 3D marks. The Commission found that the goods are the same. In fact, these are not just shoes. They're all molded foam clogs. But are the merits before us? Did you file in time? Yes, Your Honor, we did. Crocs filed a timely notice of appeal pursuant to the plain language of Section 1337, 1337C and 1337J. There was a single statement of decision in this case constituting the determination. That determination included relief that was subject to presidential review. Under 1337J, a statement of decision, a determination subject to presidential review is effective when filed, and this also comes from the Young Engineering case, but not final until following the presidential review period. How do you deal with Broadcom, which in that case, there were two different determinations within a single decision? Slightly different facts there, because the question was whether an earlier appeal was premature, but it's analogous in the sense that it is talking about two different decisions. I think there was maybe one patent was found valid and infringed, and the other two patents were found invalid, and there were different appeal timing requirements for those two different determinations within the same decision. So why doesn't that apply here? So, Your Honor, if you look at the appeal briefing in the Broadcom case, which we've cited in our briefing, there were actually two separate statements of decision in Broadcom, and that's what distinguishes Broadcom from this case. There was a first statement of decision, a first determination where certain patents were found not infringed, invalid, that sort of thing, and then there was a second later statement of decision constituting a separate determination where it was subject to presidential relief. That is not – Were they issued on the same day? They were not issued on the same day, no, Your Honor. In fact, they were issued on different days, and that became the issue. And then, as you noted, there was even in that case an argument, as I think Your Honor said, about the ripeness of the first appeal. But that is – both Broadcom and Allied are different in that regard. In this case where you've got two different sets of respondents, why should the finding as the defaulting respondents change the date on which a notice of appeal should be filed for the active respondents? I mean, they're separate parties, right? Well, we have – sure, we have the active respondents and we have the defaulting respondents, but it is the single – it was the commission's single determination as to all of those issues containing all of the commission's findings and conclusions that's the subject of this appeal. Why does that procedural difference, though, between this case and Allied and Broadcom make a legal difference here? Because when the statute refers to a determination, a final determination, it is referring to a statement of decision. Here we have a single statement of decision that was the subject of notice in the Federal Register, and it is that single statement of determination that includes all of the relief set forth therein, all of the findings and conclusions, both the findings and conclusions that were adverse to Crocs and those that were in favor. So you were – your client was adversely affected by that decision at that time? Well, that decision contains findings and conclusions that were not favorable, but that determination itself as a whole did not become final until after the presidential review period. So I would say that there was a mixed decision in that case. It doesn't affect when the determination becomes final. That comes straight from the statute, 1337J, which – and Young Engineers, which is this court's determination that contains favorable – contains a remedy that's subject to presidential review, does not become final until after the presidential review period. But that – in that case, Young Engineers, that case only involved findings of infringement and violation of Section 1337, right? So it's distinguished from the facts here. Well, it doesn't – it doesn't – I agree that it's – Yes. Because it's a single determination, but you agree factually that Young Engineers is different, right? It doesn't include real – it doesn't include findings and conclusions that were – that were against the party. That's right. That were against the patent owner. Yes, that's right. But it still – it still says – stands for the proposition that when you read the statute, Section 1337C and 1337J together, and you have a final determination, that final determination is not effective when issued, but only following the presidential review period does it become final. In your view – yeah, it's my understanding that your view is, had the commission file – submitted – issued two different decisions, one for the defaulting respondents and one for the active respondents, the outcome in this case would be different. If there were two separate determinations that were issued – Two separate papers. Two separate papers issued, two separate notices published, then the outcome – then we would have had the ability to submit an appeal earlier. But here we didn't have that ability, and an earlier notice would not have been right because there was a single determination, single statement of decision that was subject to presidential review. Is this an issue of first impression? Well, the court doesn't have a decision squarely addressing this subject. You have to look at young engineering, which I think controls, and then allied and broadcom, which are distinguishable. Well, you can get to the merits. Thank you, Your Honor. Having found that there were two different I found the first three DuPont factors all favored a likelihood of confusion. Those should have been dispositive, regardless of the weighing of other factors. But even if any doubt remains, it is erased by the commission's clear errors on the factors it reached in coming to the conclusion of no likelihood of confusion. The commission erred on questions of law, and those errors are what stood in the way of the issuance of a general exclusion order, and this court should reverse. On the first of those questions for which the commission committed error, intent to confuse, the dissent correctly points out that it was error to weigh intent to confuse against likelihood of confusion because lack of intent is largely irrelevant in determining if consumers are likely to be confused as to source. So here, intent to confuse cannot weigh anything less than neutral, but in fact, it should have been weighed in favor of a likelihood of confusion. The reason is that Orley referred to its Gator product, which is itself a reference to Crocs. It referred internally to that product and in its communications with its suppliers using the word Crocs. Its customer, Hobby Lobby, affixed a label to the products it sold calling them Crocs slides. And Emoji, one of the other active respondents, bought the keyword for Crocs. Do you see legal error with this as well? Yes, Your Honor, because the weighing of the factors, the weighing of the factors along with the ultimate conclusion is legal, is legal error. It's a matter of having weighed, not made findings about the facts, but how you weigh that intent to confuse factor, weighing it here as against a likelihood of confusion when it couldn't have weighed any less than neutral. That is legal error. And so the point I was just making on the emoji pieces, they purchased the keyword Crocs so that consumers who would be looking for Crocs would be redirected to emoji. So for all of those reasons Do you remember quickly that the Commission said or maybe it was the ALJ said that that use of the word Crocs was generic? You know, in a few instances they did. But, of course, the Commission found that Crocs, the word mark, is not generic and that it is distinctive of Crocs. So do you think those are inconsistent findings or rulings by the Commission? Yes, I do think they're inconsistent. I think that the idea that, and really there's no evidence supporting this notion that Crocs is used generically. It's merely supposition by the Commission versus the finding and conclusion that Crocs, the word mark, is distinctive and does apply. And so there's nothing, there's no support beyond the Commission's speculation for the proposition that, well, Crocs is sort of being used to refer to a product category, nothing like that. And so here, when you see someone purchasing the word, as emoji did, purchasing the keyword Crocs so that people looking for Crocs shoes would be redirected to emoji, that is strong evidence of  That's not, Your Honors, the only error that the Commission made. The Commission also erred, and again the dissent pointed this out, as to its analysis of the fame factor. The Crocs configuration marks and the classic clog, which are shown on page two of the blue brief, are instantly recognizable. And I imagine everyone in this courtroom, if they looked at those shoes, would see them and recognize that, the 3D marks, because they're that well known. The Commission erred in weighing the evidence of fame as neutral on the basis that Crocs had not shown advertising of the registered trademarks, product configuration marks, standing alone. They said that that was what was required. But as this Court has said, you can look at evidence of the goods that are addressed by the mark to determine fame. Counselor, you're into your rebuttal time. You can continue or save it or some combination thereof. Yeah. Let me just say here, Your Honor, that this is a case, again, where the Commission found that the similarity of the marks, similarity of the goods, and the similarity of the trade channels, the dispositive factors, all line up in favor of a likelihood of confusion. Reversing the Commission on any one of its factors, and we talked a little bit about fame and intent to confuse, but the survey evidence is also, there was also an error of law there, and actual confusion, as well as the conditions of sale. All legal errors in terms of the weighing. Reversing on any one of those would lead to a reversal and a confusion, and that's what we're going to do today. We're going to save the remainder of your time for you. Thank you. Mr. Bretscher. Good morning. May it please the Court. Regarding the jurisdictional question, the key point here is finality. The Commission, as is well known, issued a final determination of no violation on September 14th of 2023. At the same time, it issued a final determination denying the request for a GEO. Those are final determinations in the sense that the President has no authority to review or revise or reverse a Commission's no violation determination. How do you respond to the argument being made that a final determination is a single statement of determination, like a single paper, and that it's a single notice in the register? Well, that's simply not correct. I mean, as this Court held in Young Engineers, the term determination means a decision, and the Court even went on to say that the term determination in Section 3-7 is used in different ways in different parts of the statute. When we look at Section J, which refers to presidential review, that only refers to a determination that includes a remedial order, because it's only the remedial order that's reviewed by the President. So whether we have one paper or two papers, it doesn't change the President's statutory authority that he cannot review a no violation determination, and he cannot review the denial of a request for a general exclusion order. If we're going to get into how many pieces of paper we're supposed to print out, I mean, that just completely detracts from this Court's precedent in 40 years of holdings, that finality is determined by the nature of the decision. Specifically, finality means there's a decision on the merits whether to exclude certain products, and there's no further administrative or presidential proceeding. It's not about whether there's one cover or two covers, or one notice or two notes. That puts the authority solely on the Commission about whether something is final or not. Well, it's the Court that's decided what's final. Do you know of any other area of the law? I mean, this is kind of a special thing with the presidential review period, where a single paper could have multiple final determinations with different notices of appeal time periods. I have to admit, I'm not familiar with other agencies, but in the Commission practice, it's not uncommon to have a final determination that has both a violation and no violation finding. No violation because a patent, a second patent is valid and infringed, or in this case, you have one set of respondents that violate and a second set that don't violate. This comes up quite common. And again, if we have to go down to counting the number of covers we use, it just completely detracts from this Court's precedent regarding finality. And when you're saying this Court's precedent, what cases are you thinking of? Well, I'm thinking about allied, broad, common. There's a long chain of cases about this, where finality is determined by, as I said, is it a decision on the merits? Does it go to whether to exclude the product? And then are we finished with the administrative and presidential proceedings? So in allied, there was a no violation finding, even before the rest of the case was done, because there was nothing more to be done respecting that particular patent. Broadcom moved up the framework a little bit, as Your Honor mentioned, so that there was one notice stating one patent is not infringed, a second patent is infringed. But the timing doesn't change the result. The result is because of that principle about finality. So this is not an unusual case. If it's unusual, it's only because we have that provision, Section 337J. I mean, if, for example, we took that out as a thought experiment, everything would have a 60-day deadline. It's only when we put in Section 337J, and then we read it on its terms, that we find a determination with a remedy order. That's what's reviewed by the President. What's your best response to the argument that this is not a jurisdictional question, and therefore that we can apply equitable tolling? Well, we would disagree, of course, and the courts disagreed for 40 years. Referring specifically to the Harrow case, Harrow does not say that every deadline is not jurisdictional. It says there's only a presumption of tolling. Now, in our case, we have several factors that we need to take into consideration. One is our statutory language itself. This 60-day deadline is integral to the one sentence in all of Section 337 that speaks to this court's jurisdiction. Specifically, there has to be a notice of appeal from a final decision on the merits filed within 60 days, and then it falls under subsections D, E, F, or G. So that's all one integral part of the statute. Secondly, when Congress amended Section 337 in 1984 to explicitly add that 60-day deadline, Congress said at the time that this was part of a package of amendments to improve and correct the jurisdiction of this court, and it also said that notice of appeal must be filed in 60 days. So Congress's intent in this case is very clear, and we recite that legislative history on page 31 of our brief in footnote 12. What's more, we have the precedent of this court that says this provision is jurisdictional most recently. In the Realtek v. ITC case that was decided just a few months ago, the court reiterated that that sentence is jurisdictional. Now, granted that the court was speaking specifically about subparts D, E, F, and G, that language, but it's one statutory sentence. There's no reason to parse it, and as I said, Congress's intent was clear in the legislative history. And I was wondering how much weight to give those cases, like Realtek, but also Allied and Broadcom. Both those opinions say it's jurisdictional, but I couldn't tell whether the issue of jurisdiction was even litigated there, so I didn't... Well, I would say at the time, before Harrell, people would assume that a deadline is a deadline. All we believe in our case is that the legislative history, plus the statutory language, plus precedent, reinforces the concept of jurisdiction, that it's not a new change. I'll also note, if it's not jurisdictional, then it's certainly a mandatory rule. We cite cases like Nutraceutical, and there's a Suganti case we cite in our Rule 28J letter. It's mandatory at a minimum, because it goes directly to regulating this court's orderly proceedings. In other words, parties should not have to wait five weeks after the 60 day deadline expires to find out if there's going to be a notice of appeal. And Crocs, moreover, has never made a case for equitable tolling. They didn't do it in their opening brief when they were required to do it. They didn't do it today, and the facts don't support any equitable tolling. This was a decision solely by Crocs. There was no problem with the commission's service, no problem with email addresses or quorums like in Harrell, no problems with the court's filing procedures. This was solely Crocs' decision to wait five weeks. How about their argument that there was some lack of clarity in the law? There's no clarity at all. When the commission issues a notice, they notice the final determination of no violation by participating respondents. This is clear as a bell. It's restated in the opinion. The opinion, moreover, simply adopted the findings in the ID. So there was no question about what was happening here. And the fact that the commission also entered their remedial orders for the defaulters at the same time, that's just administrative deficiency. I mean, the commission is going to terminate an investigation, it's going to wrap up everything at the same time, and it's going to issue their remedial orders to defaulters who were found in default a year before. So that part of the case is a no-brainer. Assuming we don't agree with you, you want to deal with the merits? Sir. It's rather surprising to have Crocs come here. I never mentioned the history of Crocs' own shoes. And I would direct the court's attention to the opening pages of Crocs' posterior brief, which is in the appendix. But the classic clog that everybody's familiar with was introduced in, I think, 2002. At the time, it was covered by a design patent, and Crocs had great success, as we all know, for approximately 15 years before these trademarks even issued. So even though the trademarks were part of that original design, there's many, many factors that drove the success and the recognition of that shoe. It's just the concept of having a plastic molded clog was new at the time. It's comfortable, it's colorful, it has that kind of lovable ugliness to it. You can decorate it. This court referred to various converging lines and focal points in its first Crocs opinion, Crocs v. ITC, several years ago. So the commission was faced with the task of trying to discriminate between what factors lead to associations that are covered by the trademark versus what factors are not covered by the trademark. As I said, the general clog design. To do that, the commission looked primarily to these surveys. And Crocs, in fact, told us at the time that the surveys were the best evidence of confusion. I'm sorry. That's a Dependix 95761 that was in the post-hearing brief, and we cite it in our brief on page 35. So Crocs itself directed us to consider those surveys, and because of this unique history of the shoe, we cannot rely on just visual similarities alone, because there's lots of visual elements that can lead people to associate a shoe with Crocs or not. So we look at the surveys. We discussed these at length in our brief. I have some time. Let me just address quickly some of the other elements they raised. The fame issue. Here again, we have a problem that the fame of the shoe is due to many, many factors. Colors and comfort and marketing. But fame needs to be focused on those specific trademark elements if it's supposed to counter likelihood of confusion. That's the kind of evidence the commission was looking for, and that's the kind of evidence Crocs did not provide, at least not sufficiently. Intent, I'll touch on briefly. Intent can go against the likelihood of confusion when parties like Orly specifically redesigned their shoe to avoid likelihood of confusion. The Orly redesign, for example, does not contain any of the trademark elements. You think that the fact that they redesigned shows that their original design doesn't have confusion? Well, I think they originally believed their shoe did not infringe, because it is different. It has a different look. It has certainly a very different price point. It's $10 versus... The fact that they designed showed that they had no bad intent with respect to their first design? Yeah, and then they redesigned it to get even farther away from the trademark. What about the point, can you respond specifically to the point about how the commission found that the mark was not generic, but then explained that the accused infringer's use of the mark was simply to use it as a generic phrase? Right. Well, the Crocs mark appears in the heel strap of the shoe. It's all in caps, and it's a recognizable name. This is where, I think if I remember correctly, the accused infringing shoe, they always have a tag on it that says it's a Croc-like shoe or a Croc shoe? Yeah, there's several things here. First of all, the Orly shoes have their own tag on the top that says Coexist or Spring Shop, so it's not mimicking the Croc label on the tag that the customer's really going to see. The Croc name, and it's Croc, C-R-O-C, appears on the bottom on a sticker with a lot of other information. So it's questionable to what extent a consumer's going to be misled by that when the tag on the top says it's been sold by somebody else. So this was for intent, specifically for the factor of intent, the fact that the shoe had a sticker on it that said Croc on it. Yeah, but that was from the Chinese manufacturer. It wasn't something Orly or Hobby Lobby were putting on the shoe. They labeled it differently to show they're trying to distinguish their shoe. But going to the surveys, there's multiple problems with these surveys here. Croc's own expert, Dr. Petulis, explained that the control in a survey is meant to filter out associations with the non-trademark elements so that consumers can determine to what extent consumers are identifying the shoe with Croc's because of the trademark elements. It's a common control. You filter out the noise so you're left with the actual thing you're testing. And she describes the purpose of the control in her witness statement, and I can give those pages. But the witness statement starts, appendix page 67275, and there's specific references on 67292 to the purpose of the control. But the problem then is the same expert admits that her own control does not keep the non-trademark elements constant. She uses a control that looks substantially different from a clog-like shoe, or what I'll call a bare or generic clog-like shoe. It was this black, slipper-like thing. So she admits she doesn't hold the non-trademark elements. That's at appendix page 2199922001. It's here in transcript 360 to 362. And then she also admits that not holding the non-trademark elements constant could affect her results. So the net result in having looked at her survey is that the association rate for control is artificially low, which tends to drive up the net association rate for the accused products. But even if we look at her survey at face value, putting that aside, two or at least three of the products are down in fringe, even under her own analysis. Oh, I'm sorry. I'm almost out of time. Does the Court have any questions? Do you have a final thought? Yes, thank you, Your Honor. The commission points to no statutory language, no rules, no regulations as supporting its view on the timing of the appeal, or the idea that when you have a single statement of determination, that you have to parse that to try and understand, well, you have to take an appeal at one time for what they call the negative aspects, and at another time for the positive aspects. That comes out of nowhere, and it's contrary to the statute. 1337J clearly says that 1337C is, it says, except for, let me read it here, it says, subject to the provisions, I'm talking about 1337J3, subject to the provisions of paragraph 2, such determination except for purposes of subsection C be effective upon publication thereof in the Federal Register. So that's directly contrary to the commission's view of how this works. The Harrow case, very clearly to touch on that, says that regular claims processing rules of which the 60-day time period is one. What do you think except for the purposes of subsection C means? Because subsection C, of course, is the provision that provides the timing. That means that that timing doesn't apply in the case where you have a single final determination that is subject to presidential review. That means that it is effective when issued, but it does not become final for appeal purposes until after the presidential review period. This is when it's effective, not necessarily when it's final. It doesn't say such determination shall be final upon publication in the Federal Register. It just says effective, meaning that would be when the goods, if there was an exclusion order, maybe when it would go into effect. I mean, why doesn't it say final instead of effective? Well, Young Engineers reads it, and it does say, I think, if we continue down in subsection 3 and subsection 4, Young Engineers says exactly that, that what this combination of language says in section 1337 is that when you have a determination that's subject to presidential review, it is effective when issued, but it does not become final until after the presidential review period. So if you put together It doesn't become final for purposes of appeal under section C. That's right. Right. That's right. It doesn't become final for purposes under C until after the presidential review period, which supports our argument. What is your best support for why a final determination, which is what the language and the statute uses, why that's referring to, it can't be referring to different determinations for different respondents as opposed to it has to be a single paper. What is your best statutory support for that? Well, my best It's really the meaning of a final determination. Yeah. My best support is that when you look at the way that the statute, section 1337 is laid out, it doesn't refer to different determinations for different respondents. It refers to a determination that concludes an investigation. And that is what we have here, a single statement of decision, a single determination that concludes an investigation. It doesn't say single anywhere, right? It doesn't say single, but it says the determination is what is issued to conclude the investigation. And I'm paraphrasing. Where's the language that concludes the investigation from? So if we look at, for example, the commission shall determine with respect to Can you tell me which section you're referring to? Oh, I'm sorry. I'm sorry, Your Honor. Section C. Okay. Just the very first part. The commission shall determine with respect to each investigation conducted by it under this section. That each investigation is referring to the investigation encompassing all of the respondents. It has an investigation number. And that is the investigation that the determination in this case was issued with respect to. And that, when you follow the statutory language through, that leads to that determination becoming effective once issued, here because it had relief that it was subject to presidential review, but not final until after the presidential review period expires. Thank you, counsel. Thank you to both counsel. Case is submitted.